David Bradford on behalf of Manufactured Home Communities. May it please the Court, with the Court's permission, I'd like to reserve five minutes for rebuttal. All right. You have a clock right there, and when it says five, I'll also try to help you and watch the clock as well. Thank you. I appreciate that. The question before this Court is whether any one of three types of statements made by Ms. Jacobs are the subject of record evidence of falsity from which a reasonable jury could find that the statements were false. This Court has already determined that each of these statements are susceptible of proof of falsity and or imply facts that are susceptible of proof of falsity. These statements were made as part of a deliberate campaign of vilification that had as its acknowledged purpose driving MHC out of San Diego County because it was allegedly unfit to do business there. Each of these public statements was made not just once, each was made repeatedly. And the evidence of record shows that these statements were not only individually false, but collectively they falsely painted a picture of a company, which is a respected New York Stock Exchange company, painted a picture that that company had committed reprehensible and possibly even criminal acts. The District Court committed two errors, both of which are subject to de novo review. The first was that the District Court failed to consider at least three statements that Ms. Jacobs made that are of the type that this Court found actionable, that were more egregious than the statements the District Court did consider, and which are also the subject of record proof of falsity. The statements that the District Court refused to consider are no less demonstrably false than the ones that it did consider. The District Court's approach on a remand was in contrast to what it had done in its original opinion. In its original opinion, it dealt with these statements by categories. It identified five categories of statements. This Court then found the first two categories were not actionable, and it found the latter three categories were actionable. And it referred to those by using the term, for instance. And at page 964 of its opinion, after quoting certain examples of actionable statements, said, and I quote, as to the statements concerning these matters, we cannot declare as a matter of law no reasonable person could construe them as provably false. And yet the statements the District Court refused to consider concerned the very same matters that this Court referred to by category and are otherwise indistinguishable from those that it did consider. In fact, in Gardner, another panel of this Court, reading this Court's prior opinion, noted that in the Jacobs case, Ms. Jacobs had made several comments that MHC had lied. That's at 563 F. 3rd at 990. Among the statements that Ms. Jacobs made that MHC lied, in which the District Court refused to consider, was a statement made on January 18th that on December 6th, MHC deliberately lied to the county, told the county not to respond to a sewage backup because it was, quote, under control, and that MHC put the health and safety of this family in jeopardy, and MHC should be ashamed of itself. There's record evidence that the sewage incident was caused by sabotage by the resident. MHC responded immediately and that the problem was under control within the time that these statements were made. But in addition to that statement, Ms. Jacobs also said, and this is the statement the District Court considered, the company in this case lied to the county, said to the county that everything was fine, the sewage situation was fixed. And in fact, it was not. She said that on December the 10th. Well, the evidence shows that MHC did not say what Ms. Jacobs told the public. MHC said. On that particular statement or series of statements, does it boil down to how one looks at fixed versus under control? That distinction is important because the only way that MHC could have lied is if it had represented that the situation was fixed such that the county official should not come out there. But all MHC said was the situation is under control. And that was an accurate response. So the county didn't respond. Is that correct? No, it didn't tell the county not to respond or to respond. The night that the incident was reported, MHC said it's under control. We've called out a firm to deal with it. The county made its own decision whether to then come out there and look at it, but it never represented that it was under control. But it made its own decision not to come out based on the statement it's under control. Correct. And that was an accurate response. And I assume that was the intent of the statement. It's under control. Therefore, you don't need to come out. No, the county never – if you look at the transcript and the notes of the discussion with the county, which are reported by the county, the county simply called to inquire on the status of this. The county is never asking should we come out or not. They got a complaint. They called the park manager and said what's going on. The park manager said we've called a firm to come and address this. The county characterizes that as saying he therefore told us the situation was under control because he told us a firm was coming out. That was a truthful statement. A firm was immediately dispatched. Was it, in fact, under control? I'm sorry? Was it, in fact, under control? Yes, it was under control because – Did the county find a need to respond later? No. The county came out with Ms. Jacobs on December the 9th. What it found was the contamination had been sealed off. The resident had been advised that it was not safe to live in the home. A determination had been made that the home would need to be condemned, that the damage that the resident had caused to his own home was sufficiently severe that it could not be salvaged, did not make sense to salvage it. But everything that could humanly be done to that home had been done. It had been cleaned. It had been sanitized. The areas that were affected had been walled off so nobody could access them, and the resident was told it was not safe to return to the home. So even though this was not MHC's responsibility, it did everything it humanly could. And every document that the county has refers more specifically to what MHC said. They said specifically, and I'm referring now to Ms. Jacobs, chief of staff, that MHC told – the park manager said the carpet had been removed and the home would be cleaned and sanitized by Monday. She then goes on to say the county team did not go out because we were told the What did that refer to? It referred to the fact that MHC said the carpets will be cleaned and the home will be sanitized, which is exactly what happened. Beyond that, the DEH report, which is at ER 179, also says MHC told the county the carpets had been removed and the home would be sanitized, all of which was true. And on the news report, which is at ER 138 on December 10, Mr. Munter, the county official, said that what MHC told the county was plumbers and repair work had been initiated to take care of the problem. And that's not saying don't come out or the problem's fixed. They said we're going to get this place sanitized and cleaned, which is exactly what they did. And so the county, apparently perhaps subject to criticism it hadn't come out there sooner, blames MHC by saying that MHC deliberately lied to keep the county away. MHC had no reason to keep the county away, and the implication that it And, in fact, the evidence shows all MHC said was the situation was under control. And the county attempts to confuse this court in its brief by referring at page 11 of its brief to a statement made by MHC's park manager on December the 13th, after MHC had already been accused twice by Ms. Jacobs of lying. So at page 171 of their supplemental appendix, they attach an undated transcript where the park manager says, quote, that has been addressed when he was asked about the sewage incident. And we know the date of that transcript is really December the 13th because Ms. Jacobs is quoted as making a statement which appears on a dated December 13th transcript at ER 150, and that's the statement that the company lied. They shouldn't get away with it. They won't get away with it. And in this same report, and this is after on December 10 at ER 138, she had already accused MHC of lying once. This is a second occasion when she accuses MHC of lying. And if you read the transcript, you'll see she accuses them of lying again a second time on December 13th. And only after that, they accost the park manager, the press does, and says, why did you lie? And the park manager said, we didn't lie. And then he's asked, well, didn't you know about the sewage backup? And he said- You're almost to, you're five minutes, but you wanted to stop that. So let me interject and ask the following question. Assuming we agree with you, which I'm not sure I do, but assuming for the moment that we agree with you, is your company a public figure? Our company is a public company. No, I'm talking about public figure within the meaning of First Amendment law. I would not concede that it's a public figure for that purpose, and I would say that the county has not raised legal issues or objections attendant to any of the public figure doctrines. They have sought to defend the district court's ruling and sought the ruling solely on the issue of falsity. So there may have been other arguments that they could have presented. They presented none of those arguments, and there is no record or development of those kinds of issues that that might interject in the record. I will, with that, save the five minutes. Thank you. Good morning. May it please the Court, I'm William Johnson. I'm with the Office of County Counsel here on behalf of the County of San Diego and Supervisor Diane Jacob. This case is about a big company with a lot of resources that uses litigation to criticize their business practices, and it's exactly the kind of situation that the SLAP statute is designed to protect against. The fact that we're here again and the fact that this litigation has gone on now for nearly eight years is evidence of the impact that this kind of litigation can have on people. The fact that we're here eight years later after a sewage backup in a mobile home park and Chicago lawyers are being flown out to protect the reputation of a company that long ago changed its name and branding really goes a long way to say what this case has really been about. Well, but that might be a good argument for a jury to talk about a Chicago lawyer or whatever. It did go to the Ninth Circuit once, and there were difficulties with district court opinions, and then it came back, and now it's legitimately back here. And we're back. Yeah. Okay. And I raise the issue. So I think we ought to move to the merits, and particularly to the statement that we've asked about, and I think it's been identified, is the statement having to be lying. And I would appreciate your comment on that. And I'd be happy to address that. You say in our brief that the issue here is the gist or sting of the statement, and I think that the statement, the statements, and there were several, and you'll see in the evidence that's been presented here by MHC Equity Lifestyles, nowhere in the evidence is there a declaration, statement, or anything by the manager who said these things. So if whatever he said and whatever he says he said and whatever he said he said it for has not ever been presented in evidence here. We're relying solely on second-hand, third-hand in some situations, statements by others about what he said, and then we're also relying on transcripts that were prepared by various people of tapes of news reports. And so you can imagine how these, the news report, you know, where they cut, and then there's a statement of somebody, and then there's a news reporter saying something, and they go somewhere else. And so when you read those transcripts, you're seeing these kind of statements that are all, so I just come back to the following. MHC embraces this notion that they said it was under control. That's the phrase they say, we said, and they say it in their brief that that's what we said. Okay, so that's what they say they said. The question is on December 7th when the HURT team came out the first time, the memo from the county said two things. One, we have this statement, it's under control. That's kind of a general conclusion that we're taking care of the problem. It's kind of like BP saying things are under control in the Gulf. I mean, you know, whatever that means. And then, but the second thing is they said we're going to have this work done by Monday, December 9th. Okay. So the facts are then, and this is not just about Diane Jacob, this is about multiple media outlets coming out with cameras, and you can imagine it's not just about this one backup, but there are other residents who are saying, and it's in the same memo that everybody's been citing. When they come out, there's other residents saying, this has happened to me too. We've had these other problems. And so when the media is out there, and when Diane Jacob finally comes out there, the problem has not yet been fixed. It's December 10th, and there's still evidence of the sewage spill, and that's why the media's out there. And that's why the residents have called the media to come out there, and that's why the residents have called Diane Jacob and the county out there. And it's in that context that it's not under control. And what's the date on which Ms. Jacobs first makes her statement that there's been a lie? It's sort of a little bit ambiguous, but I would say it's December 10th. It's that news publication where she's, you know, the, I think it's the Channel 10 News, and I'm thinking that's SCR 155. And that is according to the evidence, then, that there had been a statement that it would be fixed by the 9th. Yes. And she says on the 10th, when it has not yet been fixed, that they lied. Well, and remember, what she's hearing, she never talked directly to the thing. She's getting these various reports from other people that this, they told us it was going to be under control. And she gets out there, and it's not under control. And that's the jist or sting. That's the truth of what she's saying, and that's why she's saying they lied. Is it enough that she heard that from other people, or do we look to the actual facts? Well, I mean, again, I come back to MHC says that's what they said. We don't have any statement from Hannifin that he said anything different. We don't really know what he said. There were probably a bunch of things he said. He probably said it was under control. He probably said we're going to do it by the state. Excuse me. Whose burden is it to supply more sort of direct first-person evidence as to what he said? Is it your burden or their burden? Plaintiff. I mean, the plaintiff has to bring forward the prima facie evidence that what she says is false. Okay. And so what they say in their brief is he said it was under control, he being Hannifin. Okay. So that's the statement we're measuring. Is there any evidence of a different statement? Pardon me? Is there any evidence of a different statement? Well, there is. I mean, the other evidence is in the memo from Rich Haas that's part of the record, where he says we were told that it would be fixed by December 9th, and it would be clean. So, I mean, so there's kind of this factual statement that it would be done by the 9th, and then there's this conclusory statement that it's under control. Those are the two things. Now, in my view, if we're talking about sort of strict truth, I don't think it's sustainable to say that it is under control is the same thing as saying it's fixed, nor is it strict truth to say it's a lie when there's a prediction that it will be fixed on the 9th, and then on the 10th it has not been fixed. It's a prediction that doesn't come true. So if we're talking strict truth, it doesn't sound to me as though the statement, based on the evidence that we have in front of us about it's under control and it will be fixed, that doesn't sound like a lie. But my question to you is, okay, strict truth is not the test under the SLAPP statute. It is sort of sting or gist or something. So help me understand what this means within the context of SLAPP. Well, we're sort of in that wobbly area of opinion anyway, but we've gotten beyond that because of this Court's past opinion. But to the extent that we can find what is objectively verifiable truth or falsity in a statement that it's under control is really the question, I think, that was asked at the outset here. I think the question is maybe a different way to look at it. What's the lie, if I were to say to you, what is the lie? Well, I think the lie, from her standpoint, and the reason she's saying that is because by the time she gets out there, there are a bunch of residents and there's a bunch of media and they're all saying, this thing, four days later, is not fixed. And so when you measure the status of things when she's there to what they said was, we've got this under control. And I guess that's the thing. Are we looking at the overall part? Are we looking at the one home? Do we even know what we're talking about? Well, we are talking about it. There's a whole milieu of things going on in the background. We have now gotten this down to a very narrow set of issues, but in the big picture, when motions for summary judgment were granted as to all the other things that we've dealt with in this litigation, but there were two other mobile home parts that were involved. There were complaints from those. There were the same kinds of complaints about sewage backup. So all kind of in her mind is getting swooshed together, I'm sure, in a certain manner. So she's looking at a company that has the wherewithal to fix something and has the wherewithal to say it's under control, and four days later you still have somebody sleeping in this mobile home that hasn't been properly cleaned. I mean, the media reports that. So her first statement, it's a lie, was it's not under control. They lied to us when they said it was under control because they haven't gotten it under control. They haven't even gotten it under control four days later is the reason it's a lie. Now, lie under the SLAP statute, not only are we talking about gist and sting and so on, but we have a California case that says lie includes white lies, includes deception and so on. We aren't talking literal truth under the SLAP statute. Well, I mean, I think there's two things. The SLAP statute covers a whole lot of different topics, and this is this SLAP statute motion deals with a particular cause of action that happens to be defamation. So we're applying the California law as to what is sustainable as a cause of action for defamation under these circumstances. And so that's where you get to the test. We don't look to the literal truth sometimes with things because we recognize that there are a lot of hyperbole out there, especially when you're dealing with politicians and a bunch of residents. So we're going to look to the gist or the sting of the statement in the context in which they were made. And that's why I say it's absolutely critical that we say, the company says it's under control on Saturday morning and we're out there Monday night and it's still not under control. Is there a different rule for what a private citizen gets to say about this company compared to what a politician gets to say about this company? I would say no, but I have to say I haven't really looked at that. I mean, you know, that she has some special protection. I mean, obviously she's out there as a representative. She hasn't raised political speech. You haven't put that on it. Well, you know, I forget who asked the question about the public figure. I had to say to myself that I'm virtually certain that that issue was addressed in some manner in the many motions and things in the past in this case in terms of, and I can't even remember the context in which it was raised, but I believe at some point in this case a conclusion was drawn that MHC is a public figure because of the way they get out there. And they actually tried to take the position in their earlier litigation that Diane Jacobs' statements were designed to quash their speech, opinions as to what a fair rental value is. So this thing is kind of swung full circle in terms of who's trying to quash whose speech. There was one other point I really wanted to make here, and that is part of the chronology is these statements about defamation were not raised in this litigation initially. And I think it's really important to notice that these causes of action didn't get tagged on until two years after the statements were made themselves and then kind of got tagged on as, oh, by the way, to this other big lawsuit. And so we've kind of been addressing that little piece of this case, and that's why the district court granted the slap motion on the grounds that the court granted it on. And the decision of this court said, well, there may be alternative grounds, but the district court hasn't reached those yet, and that's what led to the renewal motion, and that's why we're back here. I hope I've addressed that question. One of the points worthy of making is you have the media out there, the reporters sticking microphones in the managers. Explain. Tell us. And Mr. Bradford kind of says, well, they're badgering him. Well, no, he's the manager. He could step up to the mic and say, let me explain. Let me explain what I said. Let me explain to you why it was under control. He never did that to the media, and we've never gotten any evidence in this case of what he meant and what he said. And the media was not sued in this case. The reporters that were accusing MHC of lying didn't get sued. It was just Supervisor Jacob, Supervisor Jacob, who also happened to be a party to the other big federal lawsuit that they brought. It had nothing to do with these statements in this case. I think it's important that the district court in this case found that the evidence presented by MHC that we've taken steps to fix the problem, you know, they attached the declaration of the guy from the company that came out there. Nearly the fact that they did something, that they called the plumber, that the plumber came out, doesn't prove that it's true that the situation is under control on December 7th when it's not under control on December 9th. Before you head out, I have one other question. Okay. It goes to the attorney's fees issue. And that is, it seemed odd to me that invoking Mann, that the district court basically sweeps in all the fees from round one in which the county of San Diego wasn't completely successful and then tags those to MHC. And my question is why there shouldn't have been a more careful segregation of fees on that first round as to some portion that was reduced because of the lack of full success. Let me try to address that. I mean, I think that you have these two decisions, the Lafayette case that was relied on by MHC to say we don't get anything, and then there's the Mann case that says you can apportion. And our request for fees was very modest in this case. Yeah, you guys don't get paid very much. And we don't charge a very high rate. And my guess is that the appeal of that award is probably more in the plaintiff's fees than he asked for. But to answer your question, I think the answer is that the way this evolved, it's like peeling away the onion. You had to get the first layer off to narrow it down to get the second. And so the value was that we got the onion layer peeled the first time was our analysis of it, and it narrowed the issue to these categories that we're talking about now, and then the slap motion was granted. And that's the best way I can explain it. I mean, it's obviously a case of first impression. Neither one of those cases is directly on point. And I think the district court harmonized the two in coming up with a reasoned approach to the request. Any other questions? I haven't been watching my time. Thank you. Thank you. There is no record evidence that MAT ever used the word fixed or words that would connote fixed. There's ample evidence of what it actually did say. Is there evidence that they say it would be fixed? No. They never used the word fixed. That word never shows up in any statement attributed to MHC. Is there any sort of reason to infer that what they meant and could reasonably be understood to have said that it would be fixed? No, that they would clean the carpets and sanitize it. I mean, that's true. The work would be done by December 9th when he referenced it. The work specifically they said that it would be cleaned and sanitized by Monday, which I believe is actually maybe the 8th or the 9th. But all they said was cleaned and sanitized. That shows up in the chief of staff's notes. It astounds me that someone in the position of the manager of the park or anyone for your company would never say this is going to be fixed or words to that effect. I agree. And he didn't say that. He just said, look, we're going to clean it. We're going to sanitize it. That can't be right. You get an inquiry from the county, and the county really doesn't care that someday the carpets will be cleaned. There's an ongoing situation. They want to know if it's a situation they have to respond to. The evidence is they didn't respond. So I'm confident they heard more than someday the carpets will be cleaned. I misspoke. I said someday. He said by Monday. By Monday the carpets will be cleaned. I still don't believe that's all that could have been said, because cleaning the carpet isn't the source of the county's concern. They want to know is this stuff spewing out. And they must have been told something that suggests we don't have something that's gushering and we're going to have a gusher going for the next several days. The gusher didn't go on. There's no evidence that the gusher went on. What they found was a single toilet where a resident who had a criminal background and was subject to eviction had stuffed towels down his toilet and caused a backup. The source of the sewage spill was his sabotage, which was stopped. What I'm saying to you is they must have been told something other than cleanup. They must have been told something that suggests there wasn't a continuing problem, because they didn't come out. They did come out on Monday. On Monday they came out. That's right. But when they first had this communication, they didn't. They must have heard something that gave them sufficient confidence that there isn't a problem we have to come to address. We have the Department of Health's report on what was said. And what they said themselves was said to them was, quote, the situation was under control. That's what we're looking for. That's more than the carpets are going to be cleaned by Monday. The situation is under control. So that becomes the operative statement. It's not fixed, but it's not purely a future something's going to happen by Monday statement either. I agree. And the content, what was meant by under control, is given content by the other statements they made, which is the home would be cleaned and sanitized. The situation is under control. They sent experts out to assess what was causing the problem. What else could anybody do but call MBG Construction and Flood Rescue and get them out there? They worked for 11 and a half hours. I've got a question, and that is your adversary suggests that the best evidence of what was said probably comes from the person who said it. And yet there's nothing in the record to tell us what he said. And obviously he's a person you could have got a declaration from. Why didn't you get a declaration? Frankly, for the reason that was alluded to, which is because this was one of a number of issues which were put of record, and there was nothing. And we could supply an affidavit tomorrow from the individual. This litigation has been going on for eight years. There's a lot of money being spent. You're flying. I mean, and you couldn't get a declaration from the guy who said the statement that's at issue? I think it's unfair to suggest we could not get such a declaration, because there was no evidence that the statement was made. We had the statement by the county, the official report of the county, the Department of Health's report as to what he said. You've identified the example you want us to look at, and it's your burden to make out a prima facie case. So I'm not sure I'm really comforted by the notion of, well, there have been lots of things talked about in this case. We just didn't get evidence on this one. You picked this episode to talk to us about. So what evidence of a prima facie case is there? We have Ms. Jacobs' own first account of what was said. Ms. Jacobs herself said in a different statement, the one the court refused to consider, that what MHC said was the situation was resolved. That's how she herself characterized what was said. That's what the county's report, its official report of what MHC said, stated. And I think that's more important because it shows what was Ms. Jacobs acting on, what was the information related to her. That's what's really important here. Why did she make that statement? She made that statement on January the 18th, which is the statement that the court refused to consider. And recognize that these statements are being made in the context of suggesting a criminal Well, there were three times. We had December 7th under control. Then we have them out there, as he explained, on the 10th. And things were not fixed three days later on the 10th. And that's when the news reporters were out there, and she was out there, correct? That's correct. And that is when she made the statement that they lied because it isn't fixed. Right. So she said they lied by saying that it wasn't fixed on the 10th. On the 18th of January, she made four statements accusing MHC of lying altogether. Right. The only time she said that MHC said it was fixed was on the 10th, when she went back and recounted what was said the 18th. And the other key thing is the manager was quoted on camera as saying, I didn't say it was fixed. So it's not an affidavit, but it's a transcript. When the reporter goes up to the manager, who's allegedly supposed to have said it was fixed, the reporter said, fixed, question mark, and he says, no, cleaned. So there's the manager in real time, on camera, being asked, did you say it was fixed? And he said, no, I said it was cleaned. And this is at 171. Well, but then she's saying, but look, I'm out here now, and this situation isn't fixed. But she said that before the manager was even interviewed. But was the situation, I mean, wasn't there still ongoing situation going on? There was no leaking sewage. The sewage had been stopped. The home had been essentially compartmentalized with appropriate material to sanitize and keep anybody away from it. And the recommendation of flood rescue is you've got to condemn this home. There was nothing more that MHC could do in the situation to redress or remediate it. It had done, and the contractor said, there's nothing more we can do work-wise. So in that sense, whether you use the word fixed, resolved, or whatever, it had been fully addressed. And, of course, there's still a home that's uninhabitable. That can't be cured, and the recommendation is to take down the home. And she is suggesting that MHC should be subject to criminal liability for misleading the county. That's the context in which she makes these statements, is they lied to a government agency. They kept a government agency away from here. And all that's based on a conversation that Friday night with the park manager who says, we're going to get somebody out here to clean this home and sanitize it, and that will happen by Monday, which it did, and the situation is under control, which it was because the appropriate people had been called in to do that. So to suggest that this company is not fit to do business in the county, and that the district attorney is now interested in criminal charges, which she links to this lying to a county official, that's a very different set of facts than just saying that they lied about whether the situation is under control. I mean, I know you're over time, and I apologize for detaining you. I'm just reading her statement on the 18th, which is a statement you say should have been considered. Yes. And supports your case. This is what she says. MHC deliberately lied to the county about the sewage backup in the, I'm not sure I can pronounce this, Demotchkis mobile home. MHC told the county not to respond to the sewage backup in this unit because MHC said that it had everything under control. That was a lie. It was a dangerous lie for the family that lives there and had to contend with the raw sewage in their home. MHC put the health and safety of this family in jeopardy, and MHC should be ashamed of itself. Well, she didn't say here that they said it was fixed. She said it was under control, and she says it's a lie that it wasn't under control. Well, maybe that's right that it wasn't under control. Under control is a sort of ambiguous statement as to what under control means. I mean, I think it's a fair interpretation here that someone could have looked at that and said, you know, I don't think it's under control. But that statement under control was made the night of the 7th when DEH was first called. That's what she's referring back to. The night of the 7th. I understand. I think that's exactly what I'm understanding. Right. And that's what she's understanding. Right. And that is not a deliberate lie to say the night of the 7th we called flood rescue, we called MBG, they're out there working, the situation is under control. And that's her admission of what was really said, that the term that was used was under control. And what you told the cameras. Excuse me. Please. We can calm down. It's okay. She says under control is a lie. And I'm not sure that that's wrong. It depends on what under control means. And what she's saying is they said it was under control as a way of keeping the county from coming. And I think that's a fair interpretation of the events. It may or may not be absolutely true, but it doesn't strike me as a lie. No, it may not be. It is accusing MHC of a deliberate lie of intentionally keeping the county away. Right. And I think that's not demonstrably false. That interpretation seems to me the facts will bear that interpretation. It may or may not have been true, but I don't think it's a lie. I believe a prior fact looking at the evidence. And, again, that's the standard. There's some evidence from which a reasonable prior fact could come to a different conclusion than what Your Honor is suggesting. That a prior fact looking at a department of health. No, this isn't a summary judgment issue. You've got to make a prima facie case. You need to know that a jury could find what you want them to find. I agree. Well, I'm puzzled. I mean, you're emphasizing deliberate lie. We know, at least in California, there's a case law that the lie doesn't have to be a deliberate lie. I look at her statement. She doesn't say deliberate lie. She says dangerous lie and identifies a family that explains the source of the word dangerous. She does say deliberate on January 18th. Okay. From the very beginning. And the evidence from which we could prevail and which I believe would be persuasive to a prior effect is that the manager was asked what is going on with the sewer incident. He said it's under control. We're going to clean the carpets and sanitize it by Monday. That's all he said. To say that that is a deliberate lie designed to keep the pie out of it. You know, I hate to nitpick. I'm having trouble finding where she says it is a deliberate lie. She says on the 29th it's a deliberate attempt to get these to force these people out of their homes by raising the ramps. But on the 18th she says it is a dangerous lie. She doesn't say it has to be a deliberate lie. It says they deliberately lied. Oh, they deliberately lied. Okay. I got it. No. And I even read that. I'm. Right. So clearly this is suggesting an intent to keep the county away, as Your Honor has recognized. And I think it's fair to say that anybody looking at the actual words used, which don't seem to be in dispute, that the words, because they're repeated by Ms. Jacobs herself, and they're repeated in two separate contemporaneous documents accounting for what was said, and it was specifically the two things were going to be done, the carpets were going to be cleaned, the home was going to be sanitized, and the situation is under control, that it's fair to say that for somebody who has already acknowledged her goal was to drive this company out of San Diego County because of other disagreements, for her to accuse them of deliberately lying to the county to keep the county out of there is a false statement of what MEC said. And in order to accomplish it, she. Well, isn't that, you know, in a way it's really a loss on the facts. In other words, some might say, well, the reason you say it's under control would be the reason you say that publicly is because you don't want the county breathing down your neck at that minute while you're trying to figure out whatever you're going to figure out. So she takes that fact, the guy saying it's under control, and in her alliteration of it, it means basically that's a way to push off the county, and that's not really false. It's an interpretation of the facts, isn't it? I mean, it's not an opinion. It's like a gloss. It's like you put all this, and then I write the story. It would be no different than a reporter sitting down and saying, and given all this that appears to the county, they're trying to keep the county out of, you know, out of their business or out of their mobile home park right now. I think this Court already held in the prior opinion that it's a statement that's susceptible of proof of being demonstrably false. That was the city's, or county's argument, rather, that it was a mere opinion. And for example, if the park manager had never said anything to the county, that would have been demonstrably false. That's not quite where we are now. We have an acknowledgment that the park manager said something like or conveyed the meaning that it's under control. At that point, I'm not sure our prior decision really speaks to whether that piece by itself is opinion, is fact, is actionable. I think we've narrowed the target now. And added evidence. Right, and the statement that's not opinion is that MHC lied or MHC deliberately lied with the insinuation that it did so to keep the county away in a way that endangered the health of the resident, which again was untrue because the resident was well taken care of. The resident was told immediately it's unsafe to be there. There was no danger to the life or health or safety of the resident. And she attributed the word fixed to MHC because initially to say that all MHC said was that it was under control, that would not have been demonstrably false. It was under control, being remediated and redressed. And so she accused them of actually having said on that Friday night that the situation had been fixed when it wasn't. We have your argument well in mind. We've given you considerably more time. That's appreciated. Thank you very much. Thank you. The case of manufactured.
judges: McKeown, Fletcher W. , Clifton